954 P.2d 652

Betty J. OZAKI, Individually and as Special Administrator of the Estate of Cynthia J. Dennis, Deceased, and Teruko K. Dennis, Plaintiffs–Appellants,

v.

ASSOCIATION OF APARTMENT OWNERS OF DISCOVERY BAY, Timothy W. Walker, Defendants–Appellees,

and

Peter Moli Sataraka, Does 1–20, Doe Partnerships 1–20, Doe Corporations 1–20, and Doe Governmental Entities 1–20, Defendants.

No. 19194.

Intermediate Court of Appeals of Hawai'i.

Jan. 22, 1998.

Certiorari Granted Feb. 27, 1998.

David C. Schutter and Mitchell S. Wong, David C. Schutter & Associates, on the briefs, Honolulu, for plaintiffs-appellants.

Robert P. Richards and Tamara M. Gerrard, Reid, Richards & Miyagi, on the brief, Honolulu, for defendants-appellees.

Before BURNS, C.J., and WATANABE and ACOBA, JJ.

ACOBA, Judge.

We hold that Hawai'i Revised Statutes (HRS) § 663–31 (1993), Hawai'i's modified comparative negligence statute, applies only to actions sounding wholly in negligence. Where negligence combines with other grounds of liability to cause injury to a plaintiff, we believe pure comparative negligence *principles* apply. In our view pure comparative negligence principles are best suited to accomplish a fair and equitable result by distributing a plaintiff's loss in proportion to the respective faults of the parties causing the loss. Under this approach, a plaintiff's negligence would not bar recovery but would reduce the plaintiff's recovery by an amount equal to the degree to which the plaintiff is culpably negligent.

We hold, thus, that where the intentional tortious conduct of Defendant Peter Moli Sataraka (Sataraka), the negligent conduct of Defendants–Appellees Association of Apartment Owners of Discovery Bay (AOAO Discovery Bay) and Timothy J. Walker (Walker), and the negligent conduct of Cynthia J. Dennis (Cynthia), the decedent in this case, all combined to cause Cynthia's death, liability must be apportioned among Sataraka, AOAO Discovery Bay and Walker, and Cynthia in proportion to their respective faults. Additionally, the damages recoverable on behalf of Cynthia's estate by Plaintiff–Appellant Betty J. Ozaki (Ozaki), as Special Administrator of the Estate of Cynthia J. Dennis, and by Plaintiff–Appellant Teruko K. Dennis (Teruko), Cynthia's mother, (collectively Plaintiffs) must be reduced by an amount equal to the degree to which Cynthia was negligent. As a result, we conclude that the first circuit court (the court) erred in applying HRS § 663–31 to bar Plaintiffs' recovery against AOAO Discovery Bay and Walker based on the jury's finding that Cynthia's negligence exceeded AOAO Discovery Bay and Walker's negligence.

We hold, further, that HRS § 663–10.9(2)(A) (1993) did not abolish the joint and several liability of joint tortfeasors for economic and noneconomic damages in actions in which an intentional tort is at least one of the grounds on which liability is found. That being the case here, we conclude that AOAO Discovery Bay and Walker, and Sataraka are jointly and severally liable for Plaintiffs' damages.

With regard to the appeal points which require remand, we hold that (1) expert testimony as to "future earnings" damages, (2) evidence of loss of enjoyment of life, (3) evidence of punitive damages, and (4) instructions as to mental and emotional dis-

tress should not have been excluded by the court from the jury's consideration of the estate's damages.

## I.

On July 4, 1990, Cynthia was murdered by Sataraka, her paramour, in apartment 3711 of the Discovery Bay condominium complex (the condominium).

Cynthia moved into the apartment in early June 1990. Sataraka moved in with Cynthia during the second week of June but was not a tenant of the condominium. A short time later Sataraka moved out of the apartment. Sataraka, however, continued to visit and spend nights there until a few days before the murder.

Walker, a security guard at the condominium, had seen Sataraka continuously in the building for the month prior to the murder. Walker had observed Sataraka accompanying Cynthia and entering the building via the "enterphone" and by use of a key.

On the night before the murder, Cynthia and Sataraka were both at the same nightclub. Sataraka confronted Cynthia and began talking with her. Cynthia eventually left the nightclub and when Sataraka discovered that Cynthia had left he proceeded to the condominium.

Upon arriving at the condominium at about 2:00 a.m. on July 4, Sataraka attempted to contact Cynthia by way of the enterphone. When no one answered, Sataraka asked Walker if he could wait for Cynthia. Testimony at trial was in dispute as to whether Walker permitted Sataraka to enter the building. Sataraka testified that he asked Walker to let him in and Walker opened the door for him. Detective Vernon Santos, one of the investigating officers from the Honolulu Police Department, similarly reported that Sataraka said the guard permitted him to enter after Sataraka was unable to gain access by using the enterphone. On cross-examination, Sataraka was confronted with his deposition testimony which indicated he obtained access to the building by using the enterphone but because he was unable to reach the door within the ten to fifteen seconds allowed for entry, the guard permitted him to enter.[1]

After entering the building, Sataraka discovered Cynthia was not in her apartment. Sataraka returned to the lobby and conversed with Walker.

At approximately 3:00 a.m., there was a change of security guards and Walker informed his replacement that Sataraka was "waiting for his girlfriend." A short time later, Sataraka returned to apartment 3711. Security cameras revealed that Cynthia arrived at the apartment only minutes after Sataraka arrived. According to Sataraka, Cynthia saw him and began "swearing" at him. She then opened the door to the apartment and Sataraka followed her in.

Cynthia was found dead the next day. The cause of death was determined to be asphyxia, resulting from either suffocation or strangulation. Sataraka was tried and convicted of second degree murder.[2]

On October 23, 1991, Ozaki, Cynthia's sister, individually and as Special Administrator of the Estate of Cynthia J. Dennis, and Teruko filed a complaint against AOAO Discovery Bay, Walker, and Sataraka (collectively Defendants). In the complaint, Ozaki, as special administrator, sought general and special damages on behalf of the estate for, *inter alia,* physical and mental and emotional pain and suffering, future earnings, and loss of the pleasure of being alive. Ozaki, individu-

---

1. From what we can glean from the record, the "enterphone" system at the Discovery Bay condominium complex consisted of a station at which the person seeking entry could call a residential unit. The person seeking entry could be heard over the telephone at the particular residential unit called and also seen on the resident's television set if the set was turned to the appropriate channel. A resident choosing to allow a person to enter would depress the appropriate number on the phone to "buzz" that person in. The person seeking access would then enter through a designated door within the time allowed for entry.

2. According to Hawai'i Revised Statutes (HRS) § 707–701.5 (1985), "[e]xcept as provided in [HRS] section 707–701 [Murder in the first degree], a person commits the offense of murder in the second degree if the person intentionally or knowingly caused the death of another person."

ally,[3] and Teruko sought damages for, *inter alia,* emotional and mental distress, loss of consortium,[4] and pain and suffering arising out of Cynthia's death. Punitive damages were also sought generally against all Defendants. Among other allegations, the complaint asserted that AOAO Discovery Bay was negligent in providing "security" and that Walker was negligent in "allowing [Sataraka] through a security door and onto an elevator ... which led to [Cynthia's] apartment."

On November 12, 1991, AOAO Discovery Bay and Walker filed an answer to Plaintiffs' complaint and a cross-claim against Sataraka.

In its answer, AOAO Discovery Bay admitted *respondeat superior* liability for Walker's actions in the course of his employment. Thereafter, AOAO Discovery Bay and Walker were treated as one entity in the trial.[5] Because AOAO Discovery Bay and Walker were treated as one entity, we hereafter refer to them collectively as "Discovery Bay."

Plaintiffs obtained an entry of default against Sataraka on their complaint.

Discovery Bay obtained an entry of default against Sataraka on its cross-claim seeking full indemnity or, if Discovery Bay and Sataraka were determined to be joint tortfeasors, judgment against Sataraka for any amount paid by Discovery Bay over and above its pro rata share of the judgment. Later, Discovery Bay obtained a directed verdict against Sataraka on the cross-claim.

On April 11, 1994, the court orally granted, and on April 19, 1994, entered, over Plaintiffs' objections, written orders (1) excluding evidence regarding Plaintiffs' loss of enjoyment of life claim; (2) rejecting testimony of Cynthia's future earnings; and (3) prohibiting reference to punitive damages.

The case proceeded to trial on April 12, 1994. In its instructions, the court charged the jury with Plaintiffs' proposed instructions numbers 10.1 and 14.2 which the court had modified, by deleting any claim for mental suffering and emotional distress.[6] The court refused, also over objection, Plaintiffs' proposed instruction number 11 which defined emotional distress. Further, the court refused Plaintiffs' proposed verdict form and adopted, with modification, Discovery Bay's special verdict form.[7]

On May 2, 1994, the jury returned its verdict, finding that "[AOAO Discovery Bay]

---

3. On April 26, 1994, the court orally granted a partial directed verdict in favor of Defendants–Appellees Association of Apartment Owners of Discovery Bay and Timothy W. Walker (collectively Discovery Bay) on the individual claim of Plaintiff–Appellant Betty J. Ozaki (Ozaki). The court determined that Ozaki, the sister of Cynthia J. Dennis, was not a surviving spouse, child, father, mother, or a person wholly or partly dependent upon a deceased person permitted to maintain an individual claim pursuant to HRS § 663-31 (1993), the wrongful death statute. On June 23, 1994, the court entered a written order granting Discovery Bay's motion for partial directed verdict on Ozaki's individual claim. Ozaki, individually, or as Special Administrator of the Estate of Cynthia J. Dennis and Plaintiff–Appellant Teruko K. Dennis (Teruko) (collectively Plaintiffs) fail to present any argument on this order; consequently we need not address matters relating to this directed verdict. *Hall v. State,* 10 Haw.App. 210, 218, 863 P.2d 344, 348, cert. denied, 76 Hawai'i 246, 75 Haw. 581, 868 P.2d 464 (1993).

4. The jury was instructed that Teruko, Cynthia's mother, was seeking damages for loss of love and affection, loss of care, attention and acts of kindness, and loss of filial care and attention, as well as loss of "consortium." "Consortium" means the "[c]onjugal fellowship of husband and wife, and the right of each to the company, society, cooperation, affection, and aid of the other in every conjugal relation." *Black's Law Dictionary* 308 (6th ed.1990). In *Yamamoto v. Premier Ins. Co.,* 4 Haw.App. 429, 435, 668 P.2d 42, 48 (1983), this court recognized that "loss of consortium is a derivative claim arising from the loss of services, companionship, society, and conjugal benefits caused by injuries which were negligently or wrongfully inflicted upon one's spouse." The reference to "consortium" in this case thus seems inappropriate and should be deleted from the instructions on remand.

5. This treatment is consistent with *Saranillio v. Silva,* 78 Hawai'i 1, 13, 889 P.2d 685, 697 (1995) (holding that a vicariously liable employer is a joint tortfeasor with its employee under HRS § 663-11 (1985)).

6. The court also eliminated any reference to loss of support in Plaintiffs' instruction number 14.2; however, this issue was not raised on appeal.

7. The record does not contain Plaintiffs' proposed special verdict form.

and/or Walker" were negligent and that Cynthia was also negligent. The jury apportioned the fault in causing Plaintiffs' damages as 92% to the intentional conduct of Sataraka and as 8% to the negligent conduct of others. The jury further apportioned the 8% negligent conduct as 3% to "[AOAO Discovery Bay] and/or Walker" and 5% to Cynthia.

The pertinent part of the special verdict form, with the jury's answers, stated:

> Question No. 6.. Apportion the percentage of fault giving rise to the injury and/or damage to Plaintiffs in the spaces provided below:
>
> A. Intentional Conduct of Peter Sataraka 92 %
>
> B. Negligent Conduct of all other parties 8 %
>
> Total percentages of lines A and B above must equal 100%.
>
> Question No. 7.. Using the "Negligence" figure from line B, above, apportion the percentage of negligence giving rise to the injury and/or damage to the Plaintiffs in the spaces provided below. Please note that the total percentages listed below must equal the percentage of the negligence [sic] conduct attributed to all parties on line B, Question No. 6.
>
> A. Defendants AOAO Discovery Bay and/or Walker 3 %
>
> B. Plaintiff Cynthia Dennis 5 %
>
> Total percentages on lines A and B above must equal total percentage on line B, Question No. 6.

◼ On May 25, 1994, Discovery Bay filed a motion for final judgment pursuant to the special verdict and for entry of judgment. In the motion, Discovery Bay maintained that judgment should be entered in its favor because the jury found Cynthia's negligence to be greater than its negligence, thereby barring Plaintiffs' recovery under the provisions of HRS § 663–31.[8]

On the other hand, Plaintiffs argued that the jury should not have considered Cynthia's negligent fault with Sataraka's intentional conduct. Additionally, Plaintiffs reasoned that because one tortfeasor had acted intentionally, there could be no comparison of Cynthia's negligence to the negligence of other Defendants under HRS § 663–31. Finally, Plaintiffs urged that regardless of the jury's determination of Cynthia's greater negligence, Discovery Bay was jointly and severally liable with Sataraka for all of Plaintiffs' damages. .

On June 22, 1994, the court heard arguments on the motion and orally ruled as follows:

> The Court at this time will note that the intent of the Legislature was to have a tort reform be in place. So, therefore, the Court at this time will rely on [HRS § ] 663–31[ (c) ] and will reduce the amount of the award in proportion to the amount of negligence contributable [sic] to Cynthia Dennis.
>
> . . . .
>
> ... Based upon these special verdict forms, because of [sic] the plaintiff, *Cynthia Dennis' negligence was greater than the negligence of both [AOAO Discovery Bay] and Mr. Walker, the Court at this time will enter judgment in favor of [AOAO Discovery Bay] and Walker.*

Pursuant to its grant of the motion for final judgment, on July 21, 1995, the court entered a written final judgment (the judgment) in favor of Discovery Bay and against Plaintiffs on all counts in Plaintiffs' complaint and in favor of Plaintiffs and against Sataraka on all such counts.[9]

> NOW, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that, in accordance with the Special Verdict filed May 2, 1994, *Judgment is entered in favor of Defendants ASSOCIATION OF APARTMENT OWNERS OF DISCOVERY BAY and TIMOTHY WALKER and against all Plaintiffs on all counts of Plaintiffs' Complaint*, together with allowable costs, if any, as determined by the Court;
>
> IT IS FURTHER ORDERED, ADJUDGED AND DECREED that, in accordance with the

---

8. Plaintiffs' wrongful death claim was derivative and if Cynthia had no cause of action against Discovery Bay, neither did Cynthia's estate nor her survivors. *Winters v. Silver Fox Bar*, 71 Haw. 524, 535–36, 797 P.2d 51, 56 (1990); *Bertelmann v. Taas Assoc.*, 69 Haw. 95, 103, 735 P.2d 930, 935 (1987).

9. The July 21, 1995 final judgment provided, in relevant part, the following:

II.

On appeal, Plaintiffs maintain that the court erred in allowing the jury to apportion fault among Sataraka, the intentional tortfeasor; Discovery Bay, the negligent tortfeasor; and Cynthia, the negligent decedent. As they did below, Plaintiffs maintain Sataraka's intentional conduct should not have been compared to Cynthia's negligent conduct, Sataraka's intentional conduct should not have been compared to Discovery Bay's negligent conduct under HRS § 663–31, and such an apportionment was unnecessary because Sataraka and Discovery Bay were jointly and severally liable to Plaintiffs under HRS § 663–10.9 (1993).[10]

Discovery Bay, on the other hand, argues that an apportionment of fault was necessary to determine the contribution due it from Sataraka under the doctrine of joint and several liability, and to determine whether Cynthia's negligence exceeded Discovery Bay's negligence so as to bar Plaintiffs' recovery against it under the comparative negligence statute, HRS § 663–31. Additionally, Discovery Bay maintains that while under HRS § 663–10.9,[11] it may be jointly and severally liable for "economic damages," it was not liable for "non-economic damages."

> Special Verdict filed on May 2, 1994, *Judgment in the total amount of One Hundred Seventy[-]Five Thousand and 00/100 ($175,000.00) is entered in favor of those Plaintiffs and against PETER MOLI SATARAKA [(Sataraka)] on all counts of Plaintiffs' Complaint,* as follows:
>
> Plaintiff Betty J. Ozaki, as 
> Special Administrator of 
> the Estate of Cynthia J. 
> Dennis 
> (Special Damages) $10,000.00
>
> Plaintiff Betty J. Ozaki, as 
> Special Administrator of 
> the Estate of Cynthia J. 
> Dennis 
> (General Damages) $15,000.00
>
> Plaintiff Teruko Dennis 
> (General Damages) $150,000.00
>
> Total: $175,000.00

together with allowable costs, if any, as determined by the Court[.]

(Emphases added.)

III.

A.

We begin with an examination of HRS § 663–31. HRS § 663–31 provides, in pertinent part, that:

(a) Contributory negligence shall not bar recovery *in any action* by any person or the person's legal representative to recover damages *for negligence* resulting in death or injury to person or property, if such negligence was not greater than the negligence of the person, *or in the case of more than one person, the aggregate negligence of such persons against whom recovery is sought,* but any damages allowed shall be diminished in proportion to the amount of negligence attributable to the person for whose injury, damage or death recovery is made.

(b) *In any action to which (a) of this section applies,* the court, in a nonjury trial, shall make findings of fact or, *in a jury trial, the jury shall return a special verdict which shall state:*

(1) The amount of damages which would have been recoverable if there had been no contributory negligence; and

(2) *The degree of negligence of each party,* expressed as a percentage.

---

10. Plaintiffs rely, in part, on *Brown v. Clark Equip. Co.,* 62 Haw. 530, 618 P.2d 267 (1980), where the special verdict form directed the jury to consider the negligence of the parties first, with the combined negligence of the parties to equal 100%. Thereafter the jury was directed to determine the proportionate cause of the "accident" as between negligent conduct and strict products liability. Plaintiffs maintain that as in *Brown,* Discovery Bay's negligence should have been considered only with Cynthia's negligence, their combined negligence to total 100%. *Brown,* however, was not concerned with the proper apportionment among the fault of defendant tortfeasors and a negligent plaintiff, since the plaintiff in *Brown* was determined not to have been negligent. Insofar as *Brown* segregated the negligence from the apportionment of the "causes" of the incident, it appears inconsistent with *Kaneko v. Hilo Coast Processing,* 65 Haw. 447, 654 P.2d 343 (1982), discussed in the text *infra.*

11. HRS § 663–10.9 (1993) is discussed *infra.*

(c) Upon the making of the findings of fact or the return of a special verdict, as is contemplated by subsection (b) above, the court shall reduce the amount of the award in proportion to the amount of negligence attributable to the person for whose injury, damage or death recovery is made; provided that if the said portion is greater than the negligence of the person or in the case of more than one person, *the aggregate negligence of such persons against whom recovery is sought, the court will enter judgment for the defendant.*

(Emphases added.) Prior to the adoption of HRS § 663–31, a plaintiff's contributory negligence was a complete bar to recovery. *Pacheco v. Hilo Elec. Light Co.,* 55 Haw. 375, 382, 520 P.2d 62, 67 (1974).

However, HRS § 663–31 abolished this common law doctrine in the interest of fairness [12] and barred a plaintiff's recovery only "if the plaintiff's negligence [was] greater than the negligence of *all defendants involved." Id.* (emphasis added).

■ In our view, HRS § 663–31 applies only in actions which sound entirely in negligence. Our supreme court has held that HRS § 663–31 would not be applied to bar recovery where a plaintiff's negligence combined with a defendant's strict products liability to cause the plaintiff's injury. *Hao v. Owens-Illinois, Inc.,* 69 Haw. 231, 236, 738 P.2d 416, 418–19, *reconsideration granted,* 69 Haw. 674, 738 P.2d 416 (1987); *Armstrong v. Cione,* 69 Haw. 176, 180–81, 738 P.2d 79, 82 (1987); *Kaneko v. Hilo Coast Processing,* 65 Haw. 447, 654 P.2d 343 (1982). In determining that HRS § 663–31 would not apply in such situations, the supreme court concluded that "the plain meaning of the words of [HRS § 663–31] indicates the legislature has not intended to reach [the] area of [strict products liability]." *Armstrong,* 69 Haw. at 180, 738 P.2d at 82.

HRS § 663–31(a) applies "in actions ... for negligence." Under the statute the plaintiff's negligence is measured against the "negligence of the [other] person or in the case of more than one person, the aggregate negligence of such persons *against whom recovery is sought."* HRS § 663–31(a) (emphasis added). Thus, the premise of HRS § 663–31 is that, "in the action," recovery is against defendants whose liability is based on negligence. This construction appears to be confirmed in HRS §§ 663–31(b) and (c) which provide that in "any action to which [HRS § 663–31](a) applies" the court is directed to "enter judgment for the defendant[s]" when the plaintiff's negligence "is greater than ... the aggregate negligence of such persons *against whom recovery is sought."* HRS §§ 663–31(b) and (c) (emphasis added). Again, the statutory language contemplates that the "action to which [HRS § 663–31] applies" is one in which the defendants concerned were "negligent." As a result, we believe the plain meaning of the words of HRS § 663–31 restricts its application to actions wholly in the nature of negligence.

### B.

Because we conclude HRS § 663–31 applies only in actions wholly in the nature of negligence, we must determine how fault should be apportioned where negligence is considered with other theories of liability. In our view, the "comparative principles" first announced in *Kaneko* apply. *Kaneko,* 65 Haw. at 461–462, 654 P.2d at 352 (quoting *Daly v. General Motors Corp.,* 20 Cal.3d 725, 144 Cal.Rptr. 380, 385, 575 P.2d 1162, 1167 (1978)).

---

12. In *Rapoza v. Parnell,* 83 Hawai'i 78, 82, 924 P.2d 572, 576 (App.1996), this court noted that the legislature's intent in enacting HRS § 663–31 was to abolish the "unfair" doctrine of contributory negligence:

> In 1969, the legislature enacted Hawai'i's modified comparative negligence statute, and consequently, abolished the common law doctrine of contributory negligence. 1969 Haw. Sess. L. Act 277 [sic], § 1 at 422–23. The legislature abrogated the doctrine of contribu-

tory negligence because it believed the doctrine was "unfair." Hse. Stand. Comm. Rep. No. 397, in 1969 House Journal, at 778; Sen. Stand. Comm. Rep. No. 849, in 1969 Senate Journal, at 1194. In enacting this modified comparative negligence statute, the legislature "sought to temper the phase of the common law deemed inconsistent with contemporary notions of fairness." *Wong v. Hawaiian Scenic Tours, Ltd.,* 64 Haw. 401, 405, 642 P.2d 930, 933 (1982) (per curiam).

In *Kaneko*, the plaintiff, an ironworker, was injured as a result of a fall when the girt[13] he was standing on came loose. *Id.* at 448–49, 654 P.2d at 345. It was later discovered that the "clip" connecting the girt to a column[14] was defective. *Id.* At trial the jury was required to apportion liability for the accident among the strict liability of the manufacturer, the negligence of plaintiff's employer, and the contributory negligence of the plaintiff.[15] *Id.* at 449–50, 654 P.2d at 345. The jury determined that the manufacturer was 73% strictly liable, the employer was 0% negligent, and the plaintiff was 27% contributorily negligent. The trial court proportionately reduced the jury award by the plaintiff's negligence. *Id.* at 450, 654 P.2d at 345. Plaintiff's cross-appeal presented the question of whether the manufacturer's strict products liability might properly be compared with plaintiff's negligence. *Id.* at 459, 654 P.2d at 351.

The supreme court held that it might, applying "comparative negligence" principles to the opposing claims of the manufacturer's strict products liability and the plaintiff's contributory negligence.[16] *Id.* at 462, 654 P.2d at 353. In so holding, the supreme court found unpersuasive objections that (1) "strict tort liability, which was not founded on negligence or fault," was conceptually "incompatible of being reconciled" with negligence, *id.* at 460, 654 P.2d at 351, and that (2) "juries would be confused" and unable to fairly discern liability where both strict products liability and negligence were required to be apportioned,[17] *id.* at 462, 654 P.2d at 353.

Instead, the supreme court concluded that the application of comparative principles would "accomplish a fairer and more equitable result" and that "fairness and equity are more important than conceptual and semantic consistency[.]" *Id.* at 461, 654 P.2d at 352. Accordingly, it held that where a defendant's strict tort liability is established, "an injured plaintiff's award" would be reduced "by an amount equal to the degree to which [the plaintiff] is culpably and contributorily negligent." *Id.* The supreme court, thus, directed that fault be apportioned between the negligent plaintiff and the strictly liable manufacturer.

Subsequently, in *Armstrong*, the supreme court reiterated its rejection of applying HRS § 663–31 to an action where the plaintiff was found to be 67% negligent and the strictly liable defendant was 33% liable. Noting, as we have previously indicated, that the plain wording of HRS § 663–31 meant that that statute was not "intended to reach this area of the law[,]" *Armstrong*, 69 Haw. at 180, 738 P.2d at 82, the court applied "comparative negligence principles" to avoid " 'allowing a defendant to escape liability which the jury has allocated to him, irrespective of the responsibility allocated to the plaintiff[,]' " *id.* at 182, 738 P.2d at 83 (quoting *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 429 (Tex.1984)). It thus held that "it was error ... [to apply] modified comparative negligence[, HRS § 663–31,] ... to actions sounding in strict products liability." *Id.*

Finally, in *Hao*, the supreme court established that "pure comparative negligence principles" were to be applied where a plaintiff's negligence was considered with a defendant's strict products liability. There, the plaintiff, a worker exposed to asbestos dust and fibers over a thirty-one-year period of employment at a shipyard, sued for dam-

13. In *Kaneko*, 65 Haw. at 448, 654 P.2d at 345, a girt was referred to as a steel beam in a horizontal position.

14. The court in *Kaneko* referred to a column as a steel beam in a vertical position. *Id.*

15. The special verdict form also required the jury to consider the manufacturer's alleged negligence and breach of warranty. The jury found the manufacturer was negligent and had breached its warranty. This aspect of the verdict form was not challenged on appeal and, hence, was affirmed. *Id.* at 451, 654 P.2d at 345–46.

16. The Hawai'i Supreme Court posed the issue as "whether the doctrine of comparative negligence should *merge* with strict products liability." *Id.* at 459, 654 P.2d at 351 (emphasis added).

17. The supreme court also rejected the assertion that manufacturers would have less incentive to produce safe products if the size of a plaintiff's award would be reduced by that plaintiff's contributory fault. *Id.* at 462, 654 P.2d at 352.

ages sustained after he developed several asbestos-related diseases. *Hao,* 69 Haw. at 233, 738 P.2d at 417. The plaintiff was also a cigarette smoker. *Id.* The plaintiff sued numerous asbestos manufacturers and distributors. *Id.* All defendants settled except defendant Owens–Illinois. *Id.* At the conclusion of trial, the jury returned a special verdict with respect to Owens–Illinois, twenty-two other defendants, and plaintiff. *Id.* at 234, 738 P.2d at 417. The jury determined that the plaintiff was 51% responsible for his illness because of his negligence in smoking cigarettes and that the remaining defendants were together 49% at fault. *Id.* at 234, 738 P.2d at 418. The jury found Owens–Illinois only 2% responsible for the plaintiff's injuries. *Id.* The trial court entered judgment in favor of Owens–Illinois pursuant to HRS § 663–31 because the plaintiff's negligence exceeded that of all defendants. *Id.* at 234–35, 738 P.2d at 418.

The supreme court reversed the judgment and reiterated that its decision in *Kaneko* "does not require application of [Hawai'i's] modified comparative negligence statute[, HRS § 663–31]." *Hao,* 69 Haw. at 236, 738 P.2d at 418. The supreme court then went on to emphasize that "pure comparative negligence principles apply to strict products liability claims." *Id.* In describing "pure comparative negligence" the supreme court referred to the following explanation of the doctrine's principles:

> "In [pure comparative negligence], a plaintiff's contributory negligence does not operate to bar his [or her] recovery altogether, *but does serve to reduce his [or her] damages in proportion to his [or her] fault. The system in this form is designed to compensate an injured party for all of the harm attributable to the wrongdoing of the defendant; when multiple defendants are involved, all are liable to the plaintiff for their respective shares of the loss, even*

*though some may have been less negligent than he [or she].* Except for West Virginia, all of the states which have adopted comparative negligence by judicial adoption have opted for the flexibility and relative simplicity of 'pure' comparative principles. (Footnotes omitted)."

*Id.* at 235 n. 4, 738 P.2d at 418 n. 4 (quoting W.P. Keaton, *Prosser and Keaton on the Law of Torts* § 67, at 472 (5th ed.1984) and citing 4 F. Harper, F. James & O. Gray, *The Law of Torts* § 22.15 (2d ed.1986)) (emphasis added).

### C.

This case does not involve defendants who are liable on the theory of "strict products liability." [18] Nevertheless, we believe the issues here are sufficiently analogous to those in *Kaneko, Armstrong,* and *Hao* to make the application of "pure comparative negligence principles" appropriate.

At the outset, we find that by the plain language of HRS § 663–31, the legislature did not intend that statute "to reach the area" of intentional torts. *Cf. Armstrong,* 69 Haw. at 180, 738 P.2d at 82 (stating the plain wording of HRS § 663–31 meant that statute was not intended to reach strict products liability). "Since the legislature has not occupied this [field] of law, we are free[, as the supreme court was in *Armstrong,*] to fashion a rule [based on] comparative negligence [principles]" to suit the instant case. *Id.* at 180, 738 P.2d at 82. Having no precedent in our jurisdiction with respect to the apportionment of fault in an action in which the intentional conduct of a defendant, the negligent conduct of a co-defendant, and the negligent conduct of the plaintiff all combined to cause plaintiff's damages, we may look to the approach adopted in another jurisdiction.

In *Blazovic v. Andrich,* 124 N.J. 90, 590 A.2d 222 (1991), the New Jersey supreme

---

**18.** We recognize that some of the Hawai'i Supreme Court's rationale expressed in *Hao v. Owens–Illinois, Inc.,* 69 Haw. 231, 236, 738 P.2d 416, 418–19, *reconsideration granted,* 69 Haw. 674, 738 P.2d 416, 418–19 (1987); *Armstrong v. Cione,* 69 Haw. 176, 738 P.2d 79 (1987); and *Kaneko,* 65 Haw. 447, 654 P.2d 343 (1982), for the application of "pure comparative negligence principles" rest on public policy reasons which supported its adoption of "strict products liability." As the supreme court said, "Our desire to protect consumers and hold manufacturers and distributors accountable for placing unsafe goods in the market is best served by insuring that application of comparative negligence principles does not inadvertently create an 'all or nothing' bar to plaintiff's recovery." *Armstrong* 69 Haw. at 182, 738 P.2d at 82.

court was faced, as we similarly are, with deciding the proper apportionment of fault among "a [negligent] plaintiff, [a] negligent co-defendant, and several settling co-defendants whose alleged fault was based on intentional conduct." *Id.*, 590 A.2d at 223. The court ruled that fault was to be apportioned "among all the parties," *id.*, ordering that "the jury shall determine the relative percentage of fault of [the] plaintiff, [the negligent co-defendant,] and the intentional tortfeasors," *id.* at 234. In doing so, the court directed that "comparative negligence principles" be applied because such principles would "adhere most closely to the guiding principle of comparative fault—to distribute the loss in proportion to the respective faults of the parties causing that loss." *Id.* at 231. Thus, under the rule adopted, "the responsibility for a plaintiff's claimed injury is to be apportioned according to each party's relative degree of fault[.]" *Id.* at 231.

■ We conclude that this rule comports with the approach adopted by the Hawai'i Supreme Court in the *Kaneko* line of cases. In those cases the supreme court also adopted "comparative negligence *principles*" as best suited to "accomplish[ing] a fairer and more equitable result." *Kaneko*, 65 Haw. at 461, 654 P.2d at 352 (emphasis added). "Fairness and equity" in *Kaneko* and its progeny resulted, as in *Blazovic*, in distributing the plaintiff's "loss in proportion to the respective faults of the parties causing the loss." *Blazovic*, 590 A.2d at 231. We find this aspect of the *Blazovic* decision persuasive and conclude that where a defendant's intentional conduct, a co-defendant's negligence, and the plaintiff's negligence combine to cause the plaintiff's damages, "pure comparative negligence principles" should be applied and the plaintiff's recovery should reflect the relative degrees of fault of all culpable parties as determined by the jury.[19]

In arriving at this conclusion we disagree with Plaintiffs' contention that a plaintiff's negligence should not reduce an intentional tortfeasor's liability. We subscribe to the

belief expressed by the *Blazovic* court that decisions which "reject[ed] apportionment of fault in actions involving intentional tortfeasors" were "derive[d] from an earlier era when courts attempted to avoid the harsh effect of the contributory-negligence defense and sought to punish and deter intentional wrongdoers." *Blazovic*, 590 A.2d at 231: Under the comparative principles approach we adopt, " 'one major policy reason for ignoring the plaintiff's negligent conduct when an intentional tort is alleged—that of avoiding a bar to recovery—is gone[.]' " *Id.* (quoting Dear and Zipperstein, *Comparative Fault and Intentional Torts: Doctrinal Barriers and Policy Considerations*, 24 *Santa Clara L.Rev.* 1, 11 (1984)). We also believe, as previously indicated, that consideration of the plaintiff's negligence in the damage calculations, even where intentional tortfeasors are involved, best adheres to the principle that loss should be distributed according to the respective faults of the parties. *Id.* Finally, we are in accord with the view that comparative negligence principles should apply only to compensatory damages and that the "deterrent or punitive aspects of tort recovery" against intentional tortfeasors should be satisfied by punitive damages. *Id.*

### D.

Applying "pure comparative negligence principles," we reject Discovery Bay's argument that Cynthia's negligence must be compared to Discovery Bay's negligence to determine whether, under HRS § 663–31, Cynthia's negligent conduct exceeded Discovery Bay's negligent conduct. As intimated previously, we reach this determination because (1) HRS § 663–31 does not apply unless the action sounds entirely in negligence, *cf. Hao*, 69 Haw. at 236, 738 P.2d at 418–19; *Armstrong*, 69 Haw. at 180, 738 P.2d at 81; *Kaneko*, 65 Haw. at 447, 654 P.2d at 343, and (2) where HRS § 663–31 does not apply for that reason, "pure comparative negligence principles" would reduce a plaintiff's recovery only by an amount

19. We recognize that the application of "pure comparative negligence principles" is, as the *Kaneko* line of cases demonstrate, an evolving con-cept which may in future cases require qualification and refinement.

equal to the degree to which the plaintiff is culpably negligent.

## IV.

 Having determined that Plaintiffs' recovery against Sataraka and Discovery Bay must be reduced by an amount equal to Cynthia's 5% negligence, we are faced with the question of whether Discovery Bay is jointly and severally liable [20] with Sataraka for the remaining 95% of Plaintiffs' damages.

## A.

In 1941, Hawai'i adopted the 1939 version of the Uniform Contribution Among Tortfeasors Act (the UCATA). 1941 Haw. Sess. L. Act 24, at 188–90. Hawai'i's version of the UCATA is codified in HRS §§ 663–11 to 663–13 (1993). *Saranillio v. Silva,* 78 Hawai'i 1, 9, 889 P.2d 685, 693, *reconsideration denied,* 78 Hawai'i 421, 895 P.2d 172 (1995).

 For the purposes of the UCATA, joint tortfeasors are defined by HRS § 663–11 as "two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them." The jury determined that Discovery Bay's and Sataraka's tortious conduct resulted in the same injury to Cynthia. Applying the definition of joint tortfeasors in HRS § 663–11, we conclude that Discovery Bay and Sataraka are joint tortfeasors.[21]

Generally, joint and several liability permits the injured person to sue and recover from all wrongdoers or from any individual

wrongdoer. *Black's Law Dictionary* 914 (6th ed.1990). The principle that each joint tortfeasor is jointly and severally liable to the plaintiff is not changed by the UCATA. HRS § 663–12 does require the relative degrees of fault of the joint tortfeasors to be considered *as among themselves* "[w]hen there is such a disproportion of fault among [the] joint tortfeasors as to render inequitable an equal distribution among them of the common liability[.]"[22]

However, the joint and several liability of the tortfeasors to the injured party is not affected. Section 4(2) of the 1939 version of the UCATA corresponds to HRS § 663–12. The Commissioner's Note to UCATA § 4(2) states:

> [The section] would permit apportionment of pro rata shares of liability of the joint tortfeasors as among themselves. *It would not affect their joint and several liability toward the injured person.* . . . The draftsmen of the Act feel that there is a very strong case to be made for apportioning the common liability as among the tortfeasors when the evidence clearly indicates that one or more of the tortfeasors was much more at fault than one or more of the others. At the same time they wish to point out that *each tortfeasor is still completely and fully liable toward the injured person.*

1939 UCATA, 9 U.L.A. 153, 159 (1951) (emphases added) (footnote omitted); *Petersen v. City & County of Honolulu,* 51 Haw. 484, 485, 462 P.2d 1007, 1008 (1969) ("[The UCATA] provides for apportionment of the common liability of joint tortfeasors as among

---

**20.** "Several liability" is defined as "[l]iability separate and distinct from liability of another to the extent that an independent action may be brought without joinder of others." *Black's Law Dictionary* 1374 (6th ed.1990).

**21.** To the extent Discovery Bay admits it is jointly and severally liable to Plaintiffs for economic damages under HRS § 663–10.9(1) (1993), it apparently agrees with this conclusion.

**22.** HRS § 663–12 (1993) provides:

> The right of contribution exists among joint tortfeasors.
>
> A joint tortfeasor is not entitled to a money judgment for contribution until the joint tort-

feasor has by payment discharged the common liability or has paid more than the joint tortfeasor's pro rata share thereof.

> A joint tortfeasor who enters into a settlement with the injured person is not entitled to recover contribution from another joint tortfeasor whose liability to the injured party is not extinguished by the settlement.
>
> *When there is such a disproportion of fault among joint tortfeasors as to render inequitable an equal distribution among them of the common liability by contribution, the relative degrees of fault of the joint tortfeasors shall be considered in determining their pro rata shares, subject to [HRS § ] 663–17 [entitled Third-party practice; enforcement of the right to contribution].*

themselves, but it does not affect the joint and several liability of each defendant toward the plaintiff."). Accordingly, under HRS § 663–12 Discovery Bay would be jointly and severally liable with Sataraka to Plaintiffs.

### B.

However, in 1986, joint and several liability was abolished by HRS § 663–10.9 with certain exceptions.[23] HRS § 663–10.9 provides, in pertinent part:

> **Abolition of joint and several liability; exceptions.** Joint and several liability for joint tortfeasors as defined in [HRS] section 663–11 is abolished *except* in the following circumstances:
>
> (1) *For recovery of economic damages*[24] *against joint tortfeasors in actions involving injury or death to persons.*
>
> (2) *For the recovery of economic and noneconomic damages*[25] *against joint tortfeasors in actions involving:*
>
> (A) *Intentional torts;*
>
> (B) Torts relating to environmental pollution;
>
> (C) Toxic and asbestos-related torts;
>
> (D) Torts relating to aircraft accidents;
>
> (E) Strict and products liability torts; or
>
> (F) Torts relating to motor vehicle accidents except as provided in paragraph (4).
>
> (3) *For the recovery of noneconomic damages in actions, other than those enumerated in paragraph (2), involving injury or death to persons against*

(Emphasis added.)

23. When HRS § 663–10.9 (1993) became effective in 1986 it contained a provision for its automatic repeal on October 1, 1989. 1986 Haw. Sess. L. Act 2, § 31, at 13. Subsequent amendments extended the date of repeal until October 1, 1995. 1995 Haw. Sess. L. Act 130, § 1, at 208. However, the October 1, 1995 repeal of HRS § 663–10.9 was deleted by 1995 Haw. Sess. L. Act 130, § 1, at 208 and HRS § 663–10.9 became permanent.

24. The term "economic damage" is not defined in HRS chapter 663 (1993). However, the legislative history to HRS § 663–10.9 indicates that "lost wages, medical expenses, lost future wages, and future medical expenses" are "economic

*those tortfeasors whose individual degree of negligence is found to be twenty-five per cent or more under [HRS] section 663–31.* Where a tortfeasor's degree of negligence is less than twenty-five per cent, then the amount recoverable against the tortfeasor for noneconomic damages shall be in direct proportion to the degree of negligence assigned.

(Emphases added.)

■ As set forth in HRS § 663–10.9(2)(A), joint and several liability was not "abolished" for recovery of both economic and noneconomic damages against "joint tortfeasors in actions *involving:* (A) Intentional torts[.]" (Emphasis added.) "Involving" is the participle form of the word "involve." The word "involve" means, among other things, "to have within or as part of itself: INCLUDE." *Webster's Ninth New Collegiate Dictionary* 637 (1990).

An action "involving" intentional torts, accordingly, is one which has within it, or as a part of it, or includes an intentional tort. Such an action, therefore, is not one which only or exclusively concerns intentional torts, but which, as denoted, would include an intentional tort as at least one of the stated theories or grounds on which liability is found.[26] Obviously, then, Sataraka's conduct places the instant case squarely within the HRS § 663–10.9(2)(A) category of cases as to which "joint and several liability for joint tortfeasors as defined in [HRS § ] 663–11 [was not] abolished."

damages." Hse. Stand. Comm. Rep. No. 4–86, in 1986 Special Session House Journal, at 43.

25. HRS § 663–8.5 (1993) provides that:

> (a) Noneconomic damages which are recoverable in tort actions include damages for pain and suffering, mental anguish, disfigurement, loss of enjoyment of life, loss of consortium, and all other nonpecuniary losses or claims.
> (b) Pain and suffering is one type of noneconomic damage and means the actual physical pain and suffering that is the proximate result of a physical injury sustained by a person.

26. We point out that HRS § 663–10.9(2)(A) does not refer to the designated actions as "involving" *only* intentional torts.

We note that HRS § 663–10.9(3) preserves joint and several liability for noneconomic damages "against those tortfeasors whose individual degree of negligence is found to be twenty-five percent or more under [HRS] § 663–31" but "[w]here a tortfeasor's degree of negligence is less than twenty-five percent, the amount recoverable against th[at] tortfeasor" [is limited] to damages "in direct proportion to the degree of negligence assigned." HRS § 663–10.9(3). HRS § 663–10.9(3), then, is supportive of an intent on the part of the legislature to abolish joint and several liability for noneconomic damages in actions involving injury or death "where the tortfeasor's degree of negligence is less than twenty-five percent." But HRS § 663–10.9(3) applies only "in actions[ ] other than those enumerated in [HRS § 663–10.9](2)." Because the instant case is of the kind enumerated in HRS § 663–10.9(2) and thus is excluded from the provisions of HRS § 663–10.9(3), the latter section would not be applicable to Plaintiffs' claims.

We conclude, therefore, that HRS § 663–10.9 did not abolish joint and several liability for "actions involving . . . intentional torts." As a result, Discovery Bay and Sataraka are jointly and severally liable to Plaintiffs for noneconomic as well as economic damages, subject, as we have previously said, to a reduction in damages proportional to Cynthia's assigned negligence.

### V.

Having concluded that under the application of pure comparative negligence principles Cynthia's negligence did not bar her estate and survivors from recovering against Discovery Bay, and that under HRS § 663–10.9(2)(A) Discovery Bay and Sataraka are jointly and severally liable for damages suffered by Plaintiffs, we consider other points of error concerning the assessment of damages.

27. HRS § 663–8 (1993) provides:
 **Damages, future earnings.** Together with other damages that may be recoverable by law, the legal representative of the deceased person may recover where applicable under [HRS § ] 663–7 the future earnings of the decedent in excess of *the probable cost* of the decedent's

### A.

Plaintiffs claim that the court erred in striking the expert testimony of Dr. Louis Rose (Dr. Rose). Dr. Rose was to testify on the amount by which Cynthia's future earnings would have exceeded the cost of her own maintenance, in other words, her estate's "future earnings" damages allowed under HRS § 663–8 (1993).[27]

In determining whether the court erred in striking Dr. Rose as a witness, we apply the abuse of discretion standard of review. *Kealoha v. County of Hawaii*, 74 Haw. 308, 319, 844 P.2d 670, 676, *reconsideration denied*, 74 Haw. 650, 847 P.2d 263 (1993) ("[T]he traditional abuse of discretion standard should be applied in the case of those rules of evidence that require a 'judgment call' on the part of the trial court."). "An abuse of discretion occurs where the trial court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *State v. U.S. Steel Corp.*, 82 Hawai'i 32, 54, 919 P.2d 294, 316 (1996) (internal quotation marks and citations omitted).

The court determined that Dr. Rose was not a "credible witness" based on the factors enumerated in *State v. Kim*, 64 Haw. 598, 606, 645 P.2d 1330, 1337 (1982):

> *State versus Kim seems to indicate that prior to admitting the testimony of this expert, we have to determine his credibility.* And State versus Kim has listed certain steps to follow. In this case I have read the transcript that was attached to [Discovery Bay's attorney] Mr. Richards' memo and a full transcript including all the exhibits and the admission, whatever it is.
>
> The Court at this time, based upon that, will exercise my discretion. The court at this time will grant [Discovery

own maintenance and *the provision decedent would have made for his or her actual or probable family and dependents during the period of time decedent would have likely lived* but for the accident.
(Emphases added.)

Bay's motion to prohibit testimony of lost earnings].

(Emphasis added.)

It is apparent that the court misapprehended *Kim*. *Kim* dealt with the admissibility of expert testimony regarding the credibility of a witness, not with whether the expert was a credible witness. *Id.* at 607, 645 P.2d at 1337. Because it appears the court's ruling was based on an erroneous reading of *Kim*, we vacate the subject order.

We point out that the admissibility of an expert witness's testimony is governed by Hawai'i Rules of Evidence (HRE) Rules 702[28] and 703[29] (1993). Discovery Bay does not challenge Dr. Rose's qualifications as an expert. It apparently takes issue with the bases for his opinion.

Discovery Bay claims that Dr. Rose (1) did not speak to anyone from Cynthia's previous employer and did not know how long the employer had been in business; (2) used Cynthia's income from her last six months of employment as a basis for his calculations, even though her employment history was unstable; (3) assumed that Cynthia was entitled to reimbursement for meals, provision of a company car, and provision for medical fringe benefits without any supporting documentation; (4) did not attempt to determine Cynthia's maintenance costs; and (5) did not base his assumptions upon a one-person family for the purposes of his calculations.

Plaintiffs indicated, however, that Dr. Rose reviewed and relied upon, *inter alia*, records from some of Cynthia's employers, information of Cynthia's educational background, some of Cynthia's income tax returns, Cynthia's 1990 W-2 form, and information on various jobs which Cynthia held at one time or another from 1981 until her death in 1990. Dr. Rose also considered Cynthia's contributions to her mother, and Cynthia's "asset history." In such circumstances, we generally concur with Plaintiffs that "the extent of [the expert's] knowledge of the subject and, therefore, the accuracy of his [or her] conclusion thereon is a question of weight rather than [admissibility]." *Lovell Enter., Inc. v. Campbell–Burns Wood Prod.*, 3 Haw.App. 531, 537, 654 P.2d 1361, 1366 (1982).

As noted above, Discovery Bay asserted that Dr. Rose did not calculate Cynthia's maintenance costs. However, excerpts from Dr. Rose's deposition testimony taken on March 3, 1994 indicate that Dr. Rose made calculations with respect to maintenance costs and that in his expert opinion the present dollar amount that Cynthia would have earned over and above such costs yielded a total of $221,895.[30] Further, Dr. Rose's fi-

**28.** Hawai'i Rules of Evidence (HRE) Rule 702 (1993) provides:

**Testimony by experts.** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of opinion or otherwise.

**29.** HRE Rule 703 (1993) provides:

**Bases of opinion testimony by experts.** The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court may, however, disallow testimony in the form of an opinion or inference if the underlying facts or data indicate a lack of trustworthiness.

**30.** The following pertinent testimony is from excerpts of the deposition testimony of Dr. Louis Rose (Dr. Rose).

Q. [Discovery Bay's counsel] Family size in this case [sic] I assume you assumed a one-person family?
A. [Dr. Rose] I did not. Frankly, it's not very sensitive to the structure of the family or the number of members of the family. So I just used all consumer units.
Q. Maintenance includes food, clothing, shelter as a basis, correct?
A. Yes.
Q. Basically what you are looking at here in lay terms is you earn a certain amount of money. How much of that money are you going to spend to maintain yourself to cover yourself for what people might call the basics of food, clothing, shelter?
A. Yes.
Q. The statistics that you utilized are national statistics, correct?
A. Yes.
. . . .
Q. *[The calculations] yield[ ] the total of $221,-895 which I take it in your opinion is in present value terms the dollar amount that you foresee Cynthia Dennis to have earned over and above her maintenance costs?* By earn I mean both

nancial analysis of Cynthia's lost earnings was appended as an exhibit to Plaintiffs' memorandum in opposition to Discovery Bay's motion to prohibit testimony of lost earnings.[31] To the extent Cynthia's maintenance costs, as Discovery Bay believes them to be, may have differed from Dr. Rose's calculations, the issue is one which involves the extent of Dr. Rose's knowledge on the subject and, therefore, would relate to the weight of his testimony, not its admissibility. *Id.* at 537, 654 P.2d at 1366. We conclude, therefore, that the court abused its discretion in striking Dr. Rose's testimony and remand the estate's claim for future earnings damages for trial.

### B.

Plaintiffs contend that the court further erred by (1) excluding evidence of loss of enjoyment of life;[32] (2) prohibiting evidence of punitive damages; and (3) deleting in the jury instructions all reference to Cynthia's and Teruko's mental suffering and emotional distress. In their arguments, Plaintiffs do not distinguish estate claims from survivor claims, but rest generally on HRS §§ 663–3, 663–8, and 663–8.5 (1993).

The determination of these issues, however, requires resort to the survival statute,[33] HRS § 663–7 (1993), which governs recovery for wrongful death by the estate of a decedent and the wrongful death statute, HRS § 663–3, which pertains to such recovery by the decedent's survivors.

### 1.

We first consider the damages issues as they relate to HRS § 663–7, the survival statute. HRS § 663–7 provides:

A cause of action arising out of a wrongful act, neglect, or default, except a cause of action for defamation or malicious prosecution, *shall not be extinguished by reason of the death of the injured person. The cause of action shall survive in favor of the legal representative of the person* and any damages recovered shall form part of the estate of the deceased.

(Emphasis added.)

"[U]pon the enactment of the survival statute abolishing the rule *actio personalis moritur cum persona*[34] the only remaining obstacle to suit was removed, and the death of an injured person operated to transfer to the personal representative the claim which the deceased had on account of the injury[.]" *Rohlfing v. Moses Akiona, Ltd.*, 45 Haw. 373, 382, 369 P.2d 96, 101 (1961). Hence, "[u]nder HRS § 663–7 there survives in favor of the decedent's legal representative . . . such cause of action as the decedent himself [or herself] had at the moment of his [or her] death." *Greene v. Texeira*, 54 Haw. 231, 235, 505 P.2d 1169, 1172 (1973). As a result, it is generally accepted that "unless the [survival] statute limits damages, the recovery is the same one the decedent would have been entitled to at death[.]" W. Keeton, D. Dobbs, R. Keeton, and D. Owen, *Prosser and Keeton on the Law of Torts* § 9, at 40 (5th ed.1984) [hereinafter "*Prosser and Keeton*"]. The only limitation on damages recoverable under HRS § 663–7 relates to "defamation or malicious prosecutions," claims not involved in the instant case. Consequently, the estate may assert the claims Cynthia had at the time of her death.

### a.

In *Montalvo v. Lapez*, 77 Hawai'i 282, 301, 884 P.2d 345, 364, *reconsideration*

---

earned in terms of dollar and in terms of value of domestic services?
A. *Yes.*
(Emphases added.)

**31.** Exhibit 5A to Dr. Rose's March 3, 1994 deposition was a financial analysis created by Dr. Rose which opined that Cynthia's "lost earnings" were $221,895. Included in this exhibit was a summary of the assumptions and sources of information upon which Dr. Rose based his opinion.

**32.** Plaintiffs' briefs generally state that the court erred in precluding Plaintiffs' evidence of loss of

enjoyment of life from trial. Plaintiffs, however, do not indicate whether the court's error was with respect to Cynthia's estate, the other Plaintiffs, or all Plaintiffs.

**33.** Plaintiffs do not cite to HRS § 663–7 (1993) which would govern the estate's entitlement to damages.

**34.** This Latin maxim means, "[a] personal right of action dies with the person." *Black's Law Dictionary* 31 (6th ed.1990).

*denied,* 77 Hawai'i 489, 889 P.2d 66 (1994), the supreme court, in construing HRS § 663–8.5, stated "that, indisputably, hedonic damages are recoverable" in tort actions. It pointed out that "HRS § 663–8.5(a) (Supp. 1992) provides that 'noneconomic damages which are recoverable in tort actions include damages for pain and suffering, mental anguish, disfigurement, *loss of enjoyment of life,* loss of consortium, and all other nonpecuniary losses or claims' (emphasis added)." [35] *Id.* (quoting HRS § 663–8.5). The supreme court defined hedonic damages as "damages 'for the loss of enjoyment of life, or for the value of life itself, as measured separately from the economic productive value that an injured or deceased person would have had.'" *Id.* at 284 n. 2, 884 P.2d at 347 n. 2 (quoting *Black's Law Dictionary* 391 (6th ed.1990)).

Thus, had she survived, Cynthia would have had a cause of action for loss of enjoyment of life. Under HRS § 663–7, Cynthia's claim survived her death and, hence, her estate should have been able to sue for such damages. To hold otherwise would permit one who is merely injured by a tortfeasor to recover damages for loss of enjoyment of life but prevent the estate of one who dies from his or her injuries from a similar recovery.[36] Thus, we conclude that with regard to Cynthia's estate, the court erred in precluding Plaintiffs' evidence of loss of enjoyment of life.

b.

 In determining whether Cynthia, at the time of her death, would have had a cause of action for punitive damages, we note that it is well settled in Hawai'i that punitive damages are allowed for "willful, malicious, wanton or aggravated wrongs where a defendant has acted with a reckless indifference to the rights of another." *Goo v. Continental Casualty Co.,* 52 Haw. 235, 239, 473 P.2d 563, 566 (1970) (citing *Glover, Ltd. v. Fong,* 40

Haw. 503 (1954); *Bright v. Quinn,* 20 Haw. 504 (1911)). Cynthia would have had a cause of action against Sataraka for assault and battery. "Battery is an unlawful touching of another person without his [or her] consent." *Nishi v. Hartwell,* 52 Haw. 188, 190, 473 P.2d 116, 118 (1970), *overruled on other grounds by Carr v. Strode,* 79 Hawai'i 475, 904 P.2d 489 (1995). "Since battery usually is a matter of the worst kind of intentions, it is a tort which frequently justifies punitive damages[.]" *Prosser and Keeton* § 9, at 40. Thus, had she survived, Cynthia would have had a claim for punitive damages. Accordingly, under HRS § 663–7, Cynthia's claim for punitive damages survived her death. *See* Annotation, *Claim for Punitive Damages in Tort Action as Surviving Death of Tortfeasor or Person Wronged,* 30 A.L.R.4th 707, 710 (1984) ("Courts in a number of jurisdictions have reached the conclusion that a punitive damages claim in a tort action will survive the death of an injured party[.]"); S. Speiser, C. Krause, & J. Madole, *Recovery for Wrongful Death and Injury* § 14:6, at 20 n. 71 (3d ed.1992) [hereinafter *Recovery for Wrongful Death* ] (listing jurisdictions permitting the recovery of punitive damages under survival statutes).

Discovery Bay asserts that *Greene,* 54 Haw. at 236, 505 P.2d at 1173; *Ginoza v. Takai,* 40 Haw. 691, 704, *rehearing denied,* 40 Haw. 734 (1955); and *Enos v. Honolulu Motor Coach Co.,* 34 Haw. 5, 6–7 (1936) prohibit the award of punitive damages in wrongful death actions. These cases are inapplicable.

The primary issue in *Greene* was whether the decedent's excess earnings were a proper item of damages under HRS § 663–7. In *Greene,* the decedent's mother had recovered damages under HRS § 663–3, but appealed the judgment under HRS § 663–7, seeking further compensation for decedent's excess earnings under HRS § 663–7. The court concluded that to award further damages

---

35. *See* full text of HRS 663–8.5 at note 25.

36. This view was vividly expressed in *Jones v. Shaffer,* 573 So.2d 740, 746 (Miss.1990) (concurring opinion), which stated:

A person tortiously injured, and permanently disabled in consequence, may recover for the

diminished joy of living.... If this view does not hold for wrongful death cases, our law gives off unfortunate incentives. We invite the tortfeasor who runs over a pedestrian to back up and do it again and be sure his victim is dead.

under HRS § 663–7 would result in excessive damages and could only be justified under a theory of punishment, not compensation. Thus, *Greene* did not involve a claim of punitive damages under either HRS §§ 663–3 or 663–7.

In both *Ginoza* and *Enos* the supreme court stated that "damages awarded [under the wrongful death statute] must be compensatory and must be confined to compensation for pecuniary loss suffered by the *dependents*." *Ginoza*, 40 Haw. at 691 (quoting *Enos*, 34 Haw. at 7) (emphasis added). This is not contrary to our analysis since we have determined Cynthia's estate was entitled to punitive damages against Sataraka under the survival statute, HRS § 663–7.

■■■ However, while the estate would have a claim for punitive damages against Sataraka, we conclude the estate would have no cause of action for punitive damages against Discovery Bay. In the complaint, Plaintiffs alleged that punitive damages were recoverable for Sataraka's conduct but did not assert a specific claim for punitive damages against Discovery Bay.[37] Discovery Bay's actions were not alleged as being "willful, malicious, wanton or aggravated wrongs [consistent] . . . with a reckless indifference to the rights of another." *Goo*, 52 Haw. at 239, 473 P.2d at 566.

■■■ While Plaintiffs prayed for judgment, including punitive damages, against Defendants "jointly and severally," such damages may not be the subject of contribution among joint tortfeasors. HRS § 663–12, which defines the right of contribution among joint tortfeasors, is silent as to whether punitive damages are subject to contribution. The 1955 version of the UCATA states that "[t]here is no right of contribution in favor of any tortfeasor who has intentionally [wilfully or wantonly] caused or contributed to the injury or wrongful death." UCATA § 1(c). While the 1939 UCATA is silent as to whether punitive damages are subject to the right of contribution, we believe the underlying purposes of punitive damages, that is, to

punish misconduct and to deter the defendant and others from similar conduct in the future, weigh against permitting contribution among joint tortfeasors when the conduct of all of the joint tortfeasors is not sufficiently culpable to justify an award of punitive damages against each tortfeasor. Therefore, "[b]ecause punitive damages are designed to punish the wrongdoer, and not to compensate the injured party, they can neither be apportioned nor subject to contribution among joint tortfeasors." *Blazovic*, 590 A.2d at 231. The court, thus, did not err in excluding evidence of punitive damages with respect to Discovery Bay.

c.

■■■ Like the claims for loss of enjoyment of life and punitive damages, the estate's claim for Cynthia's emotional distress and mental anguish must be examined in the context of HRS § 663–7.

The recovery of damages for mental anguish has been permitted in assault and battery cases. *Johnson v. Sartain*, 46 Haw. 112, 119, 375 P.2d 229 (1962) (concurring opinion) ("It is well settled that, in an action for assault and battery, compensatory damages may be allowed for mental anguish 'caused by the insult of the blows received.' ") (quoting 1 J. Sutherland, *Damages* § 9, at 339 (4th ed.1916)). Further, mental anguish is one of the enumerated noneconomic damages generally recoverable in tort actions under HRS § 663–8.5. *Cf. Montalvo*, 77 Hawai'i at 301, 884 P.2d at 364 (noting that loss of enjoyment of life is one of the enumerated damages generally recoverable under HRS § 663–8.5).

Because Cynthia would have had a cause of action in tort for assault and battery had she survived, damages for Cynthia's accompanying mental anguish would be properly recoverable by her legal representative. Therefore, the deletion of the reference to mental suffering and emotional distress as it related to Cynthia from Plaintiffs' proposed

---

37. With regard to punitive damages, the complaint alleged the following: "20. The conduct of [Sataraka] justifies the imposition of an award of punitive damages. WHEREFORE, Plaintiffs pray for judgment against Defendants, jointly and severally, [for] . . . [p]unitive damages in an amount to be shown at trial[.]"

jury instruction number 10.1 [38] and the refusal of a proposed jury instruction defining "emotional distress" [39] constituted error. The resulting "jury instructions ... when read and considered as a whole, ... [were thus] prejudicially insufficient[.]" *Craft v. Peebles,* 78 Hawai'i 287, 302, 893 P.2d 138, 153 (1995).

### 2.

The wrongful death statute, HRS § 663–3, provides, in pertinent part:

**Death by wrongful act.** When the death of a person is caused by the wrongful act, neglect, or default of any person, the deceased's legal representative, or any of the persons hereinafter enumerated, may maintain an action against the person causing the death or against the person responsible for the death. The action shall be maintained on behalf of the persons hereinafter enumerated, except that the legal representative may recover on behalf of the estate the reasonable expenses of the deceased's last illness and burial.

*In any action under this section, such damages may be given as under the circumstances shall be deemed fair and just compensation, with reference to the pecuniary injury and loss of love and affection,* including (1) loss of society, companionship, comfort, consortium, or protection, (2) loss of marital care, attention, advice, or counsel, (3) loss of filial care or attention, or (4) loss of parental care, training, guidance, or education, *suffered* as a result of the death of the person *by the* surviving spouse, children, father, *mother,* and by any person wholly or partly dependent upon the deceased person.

(Emphases added.)

▮ Discovery Bay insists HRS § 663–3 does not permit recovery of damages which do not fall within the categories of "economic loss and deprivation of love, affection and companionship." It relies on *Hun v. Center Properties,* 63 Haw. 273, 279, 626 P.2d 182, 187 (1981), which noted that "HRS § 663–3 permits compensation of decedent's surviving spouse, children, parents and dependents for economic loss and deprivation of love, affection and companionship." The phrase "loss of love and affection" was intended to be given a general inclusive effect:

The plain and unambiguous language of HRS § 663–3 states that [persons enumerated in this section] may bring a claim for "pecuniary loss and loss of love and affection, including [enumerated claims]."

The term[ ] "including" expresses "an enlargement and [has] the meaning of *and* or *in addition to,* or merely [specifies] a particular thing already included within the general words theretofore used." *Black's Law Dictionary* 763 (6th ed.1990) ( [italics] in original). By using the term "including," the legislature intended the enumerated claims [in HRS § 663–3] to be exemplary of the type of claims which may be brought for the loss of love and affection. The term "including" in no way implies exclusivity. Thus

---

**38.** Plaintiffs' proposed instruction 10.1 read as follows:

[10.1] Plaintiff BETTY J. OZAKI, as special administrator of the Estate of CYNTHIA DENNIS, is seeking damages on behalf of the Estate of CYNTHIA DENNIS. The damages being sought on behalf of the Estate include damages for CYNTHIA DENNIS' physical pain and suffering, *her mental suffering and emotional distress* and funeral expenses. If you find for Plaintiffs on the issue of liability, the Estate of CYNTHIA DENNIS is entitled to damages in such amount as, in your judgment, will fairly and adequately compensate it for the damages described heretofore.

(Emphasis added.)

**39.** Plaintiffs' proposed instruction number 11 defined emotional distress as follows:

▮ The term emotional distress as used in these instructions is often described by various other terms, such as mental distress, mental suffering, or mental anguish. If you determine that any of the Plaintiffs herein are entitled to damages for emotional distress, you should award an amount which, in your judgment, will fairly compensate the Plaintiffs for such emotional distress. In arriving at the amount of such damage, you should consider:

1) All highly unpleasant reactions, such as fear or fright, anger, grief and shock.
2) Depression.
3) Anxiety, nervousness.
4) And any other emotional pain, suffering or anguish.

We do not require that on remand the court must necessarily adopt this definition of emotional distress.

it is irrelevant whether Appellants are entitled to any of the [statutorily] enumerated claims inasmuch as they have a general claim for the loss of love and affection.

*Lealaimatafao v. Woodward–Clyde Consultants,* 75 Haw. 544, 556–57, 867 P.2d 220, 226 (1994) (underscoring added) (citations omitted).

Consequently, claims brought under HRS § 663–3 must relate to the general loss of love and affection suffered by the designated survivors. *Id.; Hun,* 63 Haw. at 279, 626 P.2d at 187.

### a.

■ Plainly, it was Cynthia who suffered loss of enjoyment of life. We have held that such a claim is allowed to the estate pursuant to HRS § 663–7. Teruko, then, was not entitled to prosecute such a claim. Additionally, her claim would fail under HRS § 663–3 because it did not relate to her loss of love or affection. *Hun,* 63 Haw. at 279, 626 P.2d at 187.

### b.

■ Likewise, because of our holding, *supra,* in part V.B.1.b. that a cause of action for punitive damages survives the death of the decedent, punitive damages are not recoverable in an action under HRS § 663–3. Furthermore, an award under HRS § 663–3 would constitute a double recovery. *See* F. Harper, F. James, Jr., & O. Gray, *The Law of Torts* § 25.16, at 614 (2d ed.1986) [hereinafter *The Law of Torts* ] (stating that items recoverable under a survival statute do not duplicate recovery which may be had under a wrongful death act).

### c.

■ Plaintiffs also contend that Teruko is entitled to damages for emotional distress

and mental suffering and that it was error to delete this claim from Plaintiffs' proposed jury instruction number 14.2.[40] As we have mentioned, HRS § 663–3 permits a general claim for the loss of love and affection which would encompass claims for loss of society, companionship, comfort, consortium, or protection. *Hun,* 63 Haw. at 279, 626 P.2d at 187.

Plaintiffs cite *Tommy's Elbow Room, Inc. v. Kavorkian,* 727 P.2d 1038, 1047–48 (Alaska 1986), for the proposition that spouses, children, and other dependents of a decedent may recover for their anguish, grief and suffering as a result of the wrongful death. There the Alaska court held that "where a [wrongful death] statute allows damages for loss of companionship, comfort and guidance, it would be inconsistent to forbid recovery for the emotional pain suffered by a claimant as a result of the death." *Id.* at 1048 (citing *City of Tucson v. Wondergem,* 105 Ariz. 429, 466 P.2d 383, 387 (1970) (en banc)). However, general damages for grief and mental suffering of the survivors are not permitted in most jurisdictions. *Recovery for Wrongful Death* § 3:53, at 245 ("The majority of American jurisdictions ... hold that the grief, bereavement, anxiety, distress, or mental pain and suffering of the beneficiaries may not be regarded as elements of damage in a wrongful death action brought for the benefit of survivors."); *The Law of Torts* § 25.14, at 607 ("Most courts do not allow damages for grief and emotional distress of the survivors[.]"); *Prosser and Keeton* § 127, at 951 ("[D]amages for grief or mental suffering of the survivors are not permitted in most jurisdictions.").

But more to the point, we believe a general claim for the loss of love and affection which would encompass claims as stated in HRS § 663–3 for loss of society, companionship, comfort, consortium, or protection; loss of marital care, attention, advice or counsel;

---

40. Plaintiffs' proposed jury instruction number 14.2 read as follows:

[14.2] Plaintiff Teruko Dennis seeks damages in her individual capacity for: (1) *Mental suffering and emotional distress;* (2) Loss of love and affection; (3) Loss of care, attention, and acts of kindness; (4) Loss of society, companionship, comfort, consortium, or protection;

(5) Loss of filial care or attention; and (6) Loss of support. If you find for Plaintiffs on the issue of liability, TERUKO DENNIS, in her individual capacity, is entitled to damages in such amount as, in your judgment, will fairly and adequately compensate her for the damages described heretofore.

(Emphasis added.)

loss of filial care or attention; or loss of parental care, training, guidance, or education "clearly include[s] many intangible forms of loss ... and [a] juror may find it quite difficult indeed to distinguish [for example] a spouse's loss of love from the forbidden 'mental anguish,' with the result, probable in many cases, that substantial awards will be made for intangible losses under one name or another." *Prosser and Keeton* § 127, at 952. In our view the emotional distress and mental suffering of survivors are considered by jurors under the direction given them to compensate a survivor for the loss of a decedent's love and affection and requires no further elaboration in the instructions. Consequently, we conclude the instructions as to Teruko's damages were not "prejudicially insufficient, erroneous, inconsistent or misleading." *Craft*, 78 Hawai'i at 302, 893 P.2d at 153.

### VI.

For the foregoing reasons, we vacate the July 21, 1995 judgment and the court's September 12, 1994 order granting Discovery Bay's motion for final judgment pursuant to the special verdict. We instruct that on remand the court enter judgment jointly and severally against Sataraka and Discovery Bay and in favor of Plaintiffs, the judgment amount against Sataraka and Discovery Bay to be proportionately reduced by the amount of Cynthia's negligence.

With respect to the court's April 19, 1994 orders, we vacate the orders as they relate to the estate's claims for future earnings damages, loss of enjoyment of life, emotional distress and mental anguish, and for punitive damages as to Sataraka. The issues vacated are remanded for trial. As to the aforesaid orders, we affirm as to Teruko's claims and as to dismissal of the punitive damages claim against Discovery Bay.